```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/8/2025
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
                      :
GPC3 I, LLC,                :
                      :
            Plaintiff,   :       1:25-cv-60-GHW
                      :
      -v-             :    MEMORANDUM OPINION &
                      :           ORDER
CORT JAVARONE,       :
                      :
           Defendant.  :
                      :
------------------------------------------------------------------ X
GREGORY H. WOODS, United States District Judge:

## I.    INTRODUCTION

      Plaintiff GPC3 I, LLC ("GPC3") and Defendant Cort Javarone entered into a contract for the sale of a cryptocurrency called SHRAP. Under that contract (the "Agreement"), GPC3 agreed to pay $500,000 in exchange for Mr. Javarone's agreement to transfer tokens of SHRAP ("SHRAP Tokens"). Although GPC3 paid Mr. Javarone the $500,000 purchase price, Mr. Javarone has not transferred the SHRAP Tokens he agreed to sell. Stiffed, GPC3 filed this action asserting, among other claims, that Mr. Javarone breached the Agreement.

      Mr. Javarone has moved to dismiss the complaint under Rule 12(b)(2) of the Federal Rules of Civil Procedure. The threshold question is whether the Court has personal jurisdiction over Mr. Javarone under New York's long-arm statute. GPC3 argues that the Court has jurisdiction over Mr. Javarone based on actions he took personally—both in his individual capacity and as an officer of two entities that he owns—4D Factory, LLC ("4D LLC") and 4D Factory, Inc. ("4D Inc.") (collectively, "4D Factory"). GPC3 argues that the Court also has personal jurisdiction over Mr. Javarone based on actions 4D Factory took in New York as Mr. Javarone's agent.

      Mr. Javarone conducted business in New York, both personally and through his agent, 4D Factory. But all of GPC3's claims do not "arise from" Mr. Javarone's New York contacts,

regardless of how significant Mr. Javarone's New York contacts are. Because GPC3's claims do not

all arise from Mr. Javarone's New York conduct, Defendant's motion is GRANTED in part and the

Court will transfer this case to the Southern District of Florida, where Mr. Javarone resides and is

subject to general jurisdiction.

## II.    BACKGROUND[1]

### a.  The Parties and Relevant Non-Parties

Plaintiff GPC3 is a Delaware limited liability company, whose sole member, Vadim

Telyatnikov, is a citizen of Pennsylvania. Compl. ¶ 6. Defendant Mr. Javarone is a citizen and

resident of Florida, *id.* ¶ 7; Dkt. No. 25-2 ("Javarone Decl.") ¶ 2. Mr. Javarone individually does not

have a home, office, or a bank account in New York. Javarone Decl. ¶ 2.

4D Inc. is a closely held New York corporation. Mr. Javarone is the president and sole

shareholder of 4D Inc. Dkt. No. 28-6 at 9. Mr. Javarone formed 4D Inc., the "New York based

affiliate of 4D LLC," "in connection with 4D LLC's relocation to New York to facilitate capital

raising, and in anticipation of a potential bankruptcy filing in the Southern District of New York."

Dkt. No. 28-7 at 4. 4D Inc.'s principal place of business is 57 West 57th Street, Suite 319-01, New

York, NY. Dkt. No. 28-6 at 2.

4D LLC is a Wyoming limited liability company. Dkt. No. 28-6 at 7. Mr. Javarone is the

managing member of 4D LLC. Dkt. No. 28-6 at 8, 10. The "governing body" of 4D LLC is

composed of: Mr. Javarone, who is the managing member and "holder of 1,000,000 Membership

Units," and Northern Pacific Group, which is not a managing member of the company, but which is

---

[1] The facts are drawn from Plaintiff's complaint, Dkt. No. 1 ("Compl."), and the accompanying affidavits, declarations, and other written materials that are appended to both Plaintiff's complaint and Plaintiff's memorandum of law in opposition to Defendant's motion to dismiss, Dkt. No. 28 ("Opp'n"). Some facts are drawn from the affidavits and other written materials that are appended to Defendant's motion to dismiss. Dkt. No. 25 ("Mem."). To the extent the parties' affidavits conflict, "all factual disputes are resolved in the [non-movant]'s favor." *See transport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 580 (2d. Cir. 1993) (citation omitted). Throughout, page numbers refer to the referenced document's original pagination, except that the parties' exhibits are paginated according to PACER's pagination.

a "holder of 453,869 Membership Units." *Id.* at 10. 4D Inc. and 4D LLC have a shared "office location on 57th Street in New York City." Dkt. No. 28-7 at 4.

Neon Machine ("Neon") is a Delaware corporation with its principal place of business in Seattle, Washington. *4D Factory LLC v. Mark Long, et al.*, No. 24-adv-1319, Dkt. No. 4 ¶ 24. Argon Protocol Foundation ("Argon") is a Panamanian foundation "created by and operated at the direction of Neon Machine." *Id.* ¶ 25.

### b. The SHRAP Tokens

There are two, separate "buckets" of SHRAP Tokens relevant to this dispute—one "bucket" promised to 4D LLC because of 4D LLC's investment in, and ownership of, Neon. This is how 4D LLC ended up with its SHRAP Tokens. And a second "bucket" of 16,000,000 SHRAP Tokens promised to Mr. Javarone individually. It is this second bucket of SHRAP Tokens that Mr. Javarone promised to sell to GPC3. On July 20, 2020, 4D LLC and Neon entered into a "Operating Agreement," under which 4D LLC agreed to serve as Neon's "sole Manager" and committed to invest in Neon to fund its launch. *Id.* ¶ 35. In exchange, 4D LLC would receive a 60% equity stake in Neon. *Id.*

In March 2021, Neon began developing a videogame, "Shrapnel," which included a cryptocurrency component to make in-game purchases. *Id.* ¶ 37. Initially, the development of Shrapnel would be funded "through the issuance of . . . SHRAP Token[s]." *Id.* Neon represented to "[4D LLC], through Mr. Javarone, that [4D LLC] . . . would receive a certain amount of SHRAP Tokens, based on and *pro rata* with [its] respective ownership of Neon [], of which [4D LLC] would receive the largest share due to its 60% ownership." *Id.*

The relationship between Neon and 4D LLC broke down. *Id.* ¶¶ 39–47. 4D LLC and Neon attempted to repair the relationship by entering into a series of agreements, which "preserv[ed] [4D LLC's] 60% equity stake in Neon" and "also promised to Mr. Javarone . . . in his individual capacity,

3

future interests in about 16 million SHRAP tokens, as compensation for his services as an advisor to and director of Neon." *Id.* at 49.  Accordingly, on November 8, 2021, Mr. Javarone was assigned the rights to the 16,000,000 SHRAP Tokens at issue in this case (the "Prior Assignment").  This is how Mr. Javarone gained ownership of his bucket of SHRAP Tokens.  "Under th[at] Prior Assignment, the Tokens were subject to vesting and lock-up provisions," and not all those tokens were "freely transferable."  Compl. ¶ 3 (noting that, as of April 9, 2024, "15,800,000 of the tokens were vested, of which 4,527,778 were unlocked and freely transferable").  The Prior Assignment provided that some of Mr. Javarone's SHRAP Tokens would "be released from the lock-up provisions" on the eighth and twenty-ninth of each month.  Purchase Agreement ¶ C.

4D LLC and Neon's attempts to repair their relationship through this secondary series of agreements were equally unsuccessful.  Although Neon allegedly never disputed "Mr. Javarone's right to receive those [16,000,000] SHRAP Tokens [promised to him individually], they remain[ed] undelivered" as of the time Mr. Javarone was negotiating their sale with Plaintiff, which was documented in the Agreement and is the subject of this case.  *4D Factory LLC v. Mark Long, et al.*, No. 24-adv-1319, Dkt. No. 4 ¶ 103.  Neon also did not deliver the other "bucket" of SHRAP Tokens—those "SHRAP Tokens [promised] in proportion to [4D LLC's] equity interest in Neon." *Id.* ¶ 112.

### c.  4D Inc. and 4D LLC Declare Bankruptcy

On October 10, 2023, 4D Inc. and 4D LLC filed voluntary petitions for bankruptcy under Subchapter V of Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.  *In re 4D Factory, Inc., et al.*, No. 23-11618, Dkt. No. 1.  Mr. Javarone, on behalf of 4D Factory, hired a New York law firm, the Spence Law Office, P.C. of Roslyn, New York as bankruptcy counsel.  Dkt No. 1 at 5.

On February 22, 2024, 4D LLC[2] initiated an adversary proceeding against Neon alleging that although 4D LLC had invested in Neon in exchange for a 60% share of SHRAP Tokens, 4D LLC never received the SHRAP Tokens. *4D Factory, LLC v. Mark Long, et al.*, No. 24-1319, Dkt. No. 4 ¶ 3; Dkt. No. 28-4 at 10 ¶ 3.  4D LLC requested, among other relief, the "immediate turnover . . . of SHRAP Tokens to Plaintiff."  Dkt. No. 28-4 at 64–65 ¶ (a).  Neon disputed 4D LLC's right to the SHRAP Tokens and filed a third-party complaint against Mr. Javarone individually alleging that "Mr. Javarone changed the signature blocks on both agreements so that the 16 million total tokens would be provided to defendant Mr. Javarone personally rather than to 4D."  Dkt. No. 28-9 at 22–23.

As of March 2024, when the parties to this case began negotiating for the sale of Mr. Javarone's 16,000,000 SHRAP Tokens, both the 4D Factory bankruptcy action and the 4D LLC adversary proceeding were ongoing.

### d.  The Parties' Negotiations[3]

On March 11, 2024, Mike Kimelman, a mutual acquaintance of both Mr. Telyatnikov and Mr. Javarone, contacted Mr. Telyatnikov regarding an opportunity to purchase SHRAP Tokens. Dkt. No. 28-1 ("Telyatnikov Decl.") ¶ 6.  On March 15, 2024, Mr. Kimelman, Mr. Telyatnikov, and Mr. Javarone met virtually to discuss that opportunity.  *Id.*

The next day, Mr. Javarone emailed Mr. Telyatnikov to clarify some points discussed during the prior day's meeting.  Dkt. No. 28-4 at 5–7.  In that email, Mr. Javarone explained that the parties to the bankruptcy had consented to move the litigation "to SDNY because the Judge had indicated an expedited timetable," and that "it is highly unlikely that the tokens (including 4D's) won't be

---

[2] At various points throughout its opposition, GPC3 asserts that the plaintiff in the adversary proceeding was 4D Inc. and not 4D LLC.  *See generally*, Opp'n at 13 ("4D Inc. pursued the Adversary Proceeding against Neon Machine with Javarone's knowledge and consent.").  But the bankruptcy filings demonstrate that the plaintiff in the adversary proceeding was 4D LLC not 4D Inc.  *See generally*, *4D Factory, LLC v. Mark Long, et al.*, No. 24-1319.

[3] Throughout their negotiations, the parties do not clearly delineate those SHRAP Tokens promised to Mr. Javarone individually and those SHRAP Tokens promised to 4D LLC in proportion to its ownership stake in Neon.

delivered by" the time the parties executed the Agreement. *Id.* at 6. Mr. Telyatnikov responded that "[t]o fully consider" the proposal to purchase SHRAP Tokens he would "need a better picture of the neon machine lawsuit/claim, as it seems like there is a dispute on whether [Mr. Javarone] actually ha[s] control." *Id.* at 4–5.

On March 17, 2025, Mr. Javarone responded with further details regarding the litigation, and copied his attorney, Jake Zimmerman, "one of the lawyers representing 4D[] LLC" in the New York bankruptcy matters. *Id.* at 2. In that email, Mr. Javarone assured Mr. Telyatnikov that "[h]ow many tokens 4D is entitled to . . . is a completely separate issue from Board control," and that regardless of the outcome in the bankruptcy matter, "[w]e will obtain our property." *Id.* at 3. Mr. Javarone specifically stated that the SHRAP Token's "delivery" would "be decided on a fast track in NY court now." *Id.* Mr. Zimmerman followed up that same day, attaching to his email a copy of amended complaint in the Adversary Proceeding and two hearing transcripts. *Id.* at 2. Mr. Zimmerman opined that "Javarone's tokens are peripheral to the real issues in dispute," stating—

> The reality is that the company/defendants are essentially holding those tokens hostage to increase the pressure on Javarone and 4D Factory. They agree that the tokens belong to him . . . I do not see any valid basis for those tokens to continue to be withheld, and I expect that we will get this issue in front of the bankruptcy court relatively soon and ask the court to require that the tokens be transferred.

*Id.*

The parties' negotiations continued through April 2024. *See* Dkt. No. 28-11. Mr. Telyatnikov continued to request clarification on the impact of the bankruptcy matter and adversary proceeding on Mr. Javarone's possession of SHRAP Tokens. *Id.* at 2–5. Mr. Javarone continued to assure Mr. Telyatnikov that neither action "has any effect on delivery or terms of my tokens." *Id.* at 2–3 (noting that Mr. Javarone's attorney sent a letter requesting possession of the tokens and that Neon's "counsel acknowledged that the tokens are [Mr. Javarone's] and offered to deliver them if [Mr. Javarone] dropped the larger claims" and that Neon "cannot legally withhold [the SHRAP] as

leverage" as "that would be extortion").  And Mr. Javarone assured Mr. Telyatnikov that he "will be applying the real legal force to ensure delivery" of the SHRAP.  Dkt. No. 28-10 at 2.

At this stage, negotiations had proceeded to the point where Mr. Javarone's attorney prepared a draft purchase agreement, which included a Delaware choice-of-law provision and an arbitration clause requiring arbitration in California.  Telyatnikov Decl. ¶ 22.  On April 5, 2024, Mr. Javarone offered to change both provisions to apply New York law because he was "now on the East Coast and d[id]n't mind making those both in New York, which [he] assume[d] [Mr. Telyatnikov] [would] prefer."  *Id.* ¶ 23.  Between January and June 2024—the period during which the parties were negotiating the terms of the Agreement—Mr. Javarone resided with his girlfriend for "approximately 100 days"[4] in her New York City apartment.[5]  Dkt. No. 28-14 at 3.

On April 9, 2024, Mr. Javarone requested that Mr. Telyatnikov "let [Mr. Javarone] know if [Mr. Telyatnikov] get[s] to NY anytime," suggesting they should "meet up."  Telyatnikov Decl. ¶ 25.[6] That same day, when Mr. Javarone was in New York, Mr. Javarone and Mr. Telyatnikov executed the Agreement.  *Id.* ¶ 28.

---

[4] Mr. Javarone represents that although he was "physically present in New York[,] [he] did not have any negotiations regarding the [Agreement]" during this time in New York.  Dkt. No. 28-14 at 3.  But on April 5, 2024, Mr. Javarone offered to change the Agreement's choice-of-law and arbitration clauses to reflect New York because he had moved to New York.  Telyatnikov Decl. ¶ 23.  Because the parties present "conflicting affidavits," the Court construes this fact in GPC3's favor—Mr. Javarone spent at least some time negotiating the Agreement while in New York.  *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft*, 989 F.2d at 580.

[5] The parties dispute whether Mr. Javarone resided with his girlfriend "at this same apartment for six years between December 2015 and April 2021."  Telyatnikov Decl. ¶ 27; *see* Dkt. No. 28-15.  The Court does not need to resolve this factual dispute in Plaintiff's favor because Mr. Javarone's residence between 2015 and 2021 predates the parties' relationship with respect to the Agreement.  Because Mr. Javarone's time allegedly living with his girlfriend in New York predates the parties' negotiation, execution, or performance under the Agreement, that prior residency is not relevant to the Court's determination of personal jurisdiction here.

[6] Mr. Javarone avers that he "entered into and executed the [] Agreement in Florida" and that he did not "enter[] into . . . any contract in New York."  Javarone Decl. ¶¶ 4, 5.  But Mr. Javarone offered to "meet up" in New York on April 9, 2024—the same day Javarone executed the Agreement.  Telyatnikov Decl. ¶ 25.  It is possible—but implausible—that Mr. Javarone was offering to book a same-day flight from Florida to New York just to meet up with a newly-forged business partner.  Because the parties present "conflicting affidavits" the Court construes this fact in GPC3's favor—Mr. Javarone executed the Agreement while physically present in New York.  *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft*, 989 F.2d at 580.

**e.  The Agreement between GPC3 and Mr. Javarone**

On April 9, 2024, GPC3 and Mr. Javarone executed the Agreement regarding the sale of SHRAP Tokens.  Compl. ¶ 11.  Mr. Javarone executed the Agreement while in New York.[7]  Under the Agreement, GPC3 agreed to purchase 16,000,000 SHRAP from Mr. Javarone for $500,000.  Compl. ¶ 12, 17.

In the Agreement, Mr. Javarone represented that he "currently owns the right to 16,000,000 SHRAP Tokens."  *Id.* ¶ 12; Dkt. No. 1-1 ("Purchase Agreement") ¶ A.  Because some of the 16,000,000 SHRAP Tokens were subject to vesting and lock-up provisions under the Prior Assignment, some of those SHRAP Tokens were not freely transferable as of the Agreement's effective date.  Compl. ¶ 13.  Accordingly, the parties agreed to stagger the transfer of the SHRAP pursuant to an agreed-upon schedule.  Compl. ¶¶ 18(a)–(d); Purchase Agreement ¶¶ 4, 5.  As to the unlocked SHRAP Tokens, the parties agreed that those tokens would be "immediately transferred to GPC3" after GPC3 paid Mr. Javarone the $500,000 purchase price.  Compl. ¶ 18(a).

Mr. Javarone represented that he "has the absolute and unrestricted right, power, authority, and capacity to execute . . . this Agreement[] and perform his obligations hereunder."  Purchase Agreement ¶ 7(a).  Mr. Javarone represented that—except for the vesting and lock-up provisions set forth in the Prior Assignment—he was "not subject to any agreement, arrangement . . . or other restriction relating to the sale and transfer" of the SHRAP.  *Id.* ¶ 7(b).  Mr. Javarone also warranted that he had "good and valid marketable title to the Vested Tokens, free and clear of all liens, encumbrances . . . and all other defects of title of any type whatsoever" aside from the lock-up provisions.  *Id.* ¶ 7(c).  Mr. Javarone represented that he did not "pledge any of the SHRAP Tokens . . . in any fashion to any other persons, entities or another party in connection with the bankruptcy proceedings of 4D or otherwise."  *Id.*

---

[7] *See supra* note 4.

Mr. Javarone's representations that he could freely transfer the SHRAP, arguably, may have not been entirely accurate because Neon and Argon still had possession of the SHRAP Tokens when the parties entered into the Agreement.  Javarone Decl. ¶ 6; Purchase Agreement ¶ A.  Mr. Javarone had title to the SHRAP Tokens, but at the point he executed the Agreement, he did not have possession of them.  Mr. Javarone was simultaneously contracting with Plaintiff for the sale of his SHRAP Tokens and attempting to force Neon and Argon to transfer those same SHRAP Tokens to him.  Javarone Decl. ¶ 6.

Mr. Javarone represented that he "shall, as promptly as practicable, file a motion against Argon and Neon . . . to force the delivery and transfer of the SHRAP Tokens [and] continue to invest in new and ongoing legal efforts to force the delivery and transfer of the SHRAP."  Purchase Agreement ¶ 7(d).  GPC3 acknowledged that it was "fully aware of" the "ongoing litigation between Neon and one of more affiliates of [] [Mr. Javarone] in which [Mr. Javarone] is an officer."  *Id.* ¶ 8(e).  Mr. Javarone agreed to "copy and notify [GPC3] on all legal filings and related notices . . . so that [it] may choose to listen and follow such ongoing legal procedures."  *Id.* ¶ 7(d).  And the Agreement provided GPC3 a mechanism to recoup costs incurred if Mr. Javarone decided to "cease [his] current legal attempts to force Neon and/or Argon to transfer the Vested Tokens to [Mr. Javarone] or [GPC3]."  *Id.* ¶ 6.

The Agreement included an arbitration clause, which provided that any claim or dispute arising from the Agreement would be subject to mandatory arbitration "in the State of New York."  Purchase Agreement ¶ 14 (agreeing that the Agreement is governed by Delaware law).

### f.  Resolution of the 4D Factory Proceedings and the Alleged Breach of the Agreement

On April 9, 2024, GPC3 paid Mr. Javarone the $500,000 purchase price.  Compl. ¶ 20.  Almost immediately, "there were issues and delays" with Mr. Javarone's performance under the Agreement.  Telyatnikov Decl. ¶ 29.  Mr. Javarone explained that he was unable to transfer SHRAP

Tokens immediately because of a delay in reaching a settlement in the underlying bankruptcy action. Dkt. No. 28-10 at 5.

Neon eventually agreed to release possession of the 16,000,000 SHRAP Tokens at issue in this case to Mr. Javarone in a partial settlement reached in the 4D Factory bankruptcy. On April 27, 2024, 4D Factory filed an amended joint motion to approve a partial settlement in the bankruptcy proceeding. *In re 4D Factory, Inc., et al.*, No. 23-11618, Dkt. No. 95. Under the proposed settlement, Neon would "transfer[] 16-million unlocked SHRAP Token to Cort Javarone on April 29, 2024." *Id.* at 5 ¶ 16(c), 13 ¶ 3. That settlement distinguished between Mr. Javarone individually and 4D LLC. *Id.* ("[P]rovided that the completion of the corporate actions and governance changes described above are not otherwise delayed by the Debtors or Cort Javarone."); *id.* at 5 ¶ 16(c) ("Transfer of Javarone's Tokens."), 13 ¶ 5 ("This includes Cort Javarone's individual right to pursue any remedy and relief . . . based on his claim that the [SHRAP] . . . should have been delivered to him sooner."). That settlement agreement provided that Mr. Javarone individually would "swiftly receive 16 million unlocked tokens that will be immediately available for sale." *Id.* ¶ 25 ("Mr. Javarone intends to use some of the proceeds from these tokens to help fund the Debtors' Chapter 11 Plan."). On May 13, 2024, the bankruptcy court approved the settlement agreement. Dkt. No. 28-17.

Even after the bankruptcy court's approval of the partial settlement requiring Neon to transfer the same 16,000,000 SHRAP Tokens that Mr. Javarone promised to GPC3, Mr. Javarone never transferred SHRAP Tokens to GPC3—a fact he does not dispute. Compl. ¶ 21. Although GPC3 continued to "talk to [Mr.] Javarone in an effort to resolve [the] dispute," the parties' discussions did not lead to resolution. Telyatnikov Decl. ¶ 37. GPC3 asserts that its attempts at resolution failed because Mr. Javarone had promised to pay his attorneys in the adversary and

bankruptcy proceedings "a contingent fee from the 16,000,000 Tokens that were received from

Neon Machine, even though he had already agreed to transfer those Tokens to [GPC3]." *Id.*

Accordingly, on June 17, 2024, GPC3 filed a demand for arbitration in New York, asserting

claims for breach of contract and, alternatively, a claim for fraud. Compl. ¶ 29. On August 5, 2024,

Mr. Javarone answered the demand and the parties selected a New York arbitrator. *Id.* ¶ 30.

However, GPC3 alleges that because Mr. Javarone failed to pay his portion of the arbitration

deposit, the arbitrator terminated the arbitration. *Id.* ¶ 31–33; Dkt. No. 1-2; Dkt. No. 1-3. GPC3

alleges that, as of the date of the filing of its complaint, Mr. Javarone has retained the $500,000

purchase price, and is "us[ing] that money to fund other investments." Compl. ¶ 26.

### g. Procedural History

Plaintiff filed this action on January 3, 2025, asserting claims for breach of contract,

anticipatory repudiation of contract, unjust enrichment, fraudulent inducement, and breach of

contract for Mr. Javarone's failure to arbitrate. *See generally* Compl. The complaint asserts that the

"Court has personal jurisdiction over Mr. Javarone under NY CPLR 301(3)(i) because he regularly

conducts substantial business in New York and this action arises from acts and omissions occurring

in New York." *Id.* ¶ 9. Plaintiff alleges that in both the Agreement itself and throughout the parties'

negotiations, "Mr. Javarone made numerous representations . . . about his legal possession of the

tokens pursuant to . . . an adversary proceeding in a pending bankruptcy [in the Southern District of

New York] involving Javarone's entity, as well as his entitlement to transfer title to the tokens." *Id.*

¶ 2.

On May 28, 2025, Defendant filed his motion to dismiss,[8] in which he argues that the Court

lacks specific personal jurisdiction over him because he has not "purposely availed" himself of New

---

[8] Mr. Javarone's motion includes an additional argument that GPC3's breach of contract claim should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure because Mr. Telyatnikov signed the agreement individually and not on behalf of GPC3. Mem. at 9–10. On June 17, 2025, at Mr. Javarone's request, Dkt. No. 26, the

York law.  Mem. at 1.  Mr. Javarone contends that any allegations that he was in New York during

the Agreement's negotiations, execution, or performance are "manifestly false" and that Plaintiff

"has literally no evidence of any" connection Mr. Javarone has with New York.  *Id.* at 2, 6.  Mr.

Javarone also argues that the Court cannot exercise personal jurisdiction over him based on his

actions on behalf of either 4D LLC or 4D Inc. because both the bankruptcy and the adversary

proceeding are "entirely unrelated to the [] Agreement."  *Id.* at 2.

Plaintiff filed its opposition on June 27, 2025.  *See generally* Opp'n.  GPC3 argues that the

Court has personal jurisdiction under New York's long-arm statute because Mr. Javarone, in his

official capacity on behalf of 4D Factory, litigated the underlying bankruptcy and the adversary

proceeding against Neon, and GPC3's causes of action arise directly from that business transaction.

Opp'n at 10.  GPC3 also asserts that the Court has personal jurisdiction over Mr. Javarone because

of his physical presence in New York while negotiating the Agreement.  *Id.* at 17.  Defendant replied

on July 7, 2025, arguing that the transfer of the 16,000,000 SHRAP he promised to GPC3 was not

directly "at issue" in either the bankruptcy matter or the adversary proceeding.  Dkt. No. 29

("Reply") at 5–7.  Mr. Javarone asserts that the adversary proceeding "sought to recover . . . entirely

separate cryptocurrency."  *Id.* at 7.

On July 7, 2025, Mr. Javarone filed a letter objecting to, and moving to strike, certain

portions of Mr. Telyatnikov's declaration, which was appended to GPC3's opposition.  Dkt. No. 30.

Mr. Javarone asserts that those portions of the declaration are "without foundation, without proof

of authenticity, hearsay, and irrelevant."  *Id.* at 2.  GPC3 filed an opposition to that application on

---

Court allowed Mr. Javarone to withdraw this portion of his argument.  Dkt. No. 27.  The parties both appended
executed copies of the Agreement in their respective briefing, but the signature pages of those submissions differ.  Mr.
Javarone's submission indicates that Mr. Telyatnikov signed individually.  Dkt. No. 25-3 at 8 (including a signature page
identifying the purchaser as "Vadim Telyatnikov").  The version appended by Mr. Telyatnikov, however, indicates that
Mr. Telyatnikov signed on behalf of GPC3.  Purchase Agreement at 8 (including a signature page identifying the
purchaser as "GPC3 I, LLC" and with the notation that Mr. Telyatnikov signed in his capacity as a "member").  Because
Mr. Javarone has withdrawn his argument, the Court need not address this discrepancy.  *See* Opp'n at 1 n.1.

July 10, 2025, arguing that Mr. Javarone's submission "disregards numerous Court Rules," and that the Court may properly consider supplemental affidavits on a motion to dismiss under Rule 12(b)(2).[9]  Dkt. No. 31.  Mr. Javarone replied the next day.  Dkt. No. 32.

## III.   LEGAL STANDARD

### a.   Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2)

On a motion to dismiss pursuant to Rule 12(b)(2), the non-movant "bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010) (citing *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003) (*per curiam*)); *accord Bank Brussels Lamberts v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999) (same).[10]  The non-movant's burden of proof "varies depending on the procedural posture of the litigation." *Dorchester Fin. Sec., Inc.*, 722 F.3d at 84 (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)).  At the pleading stage, and prior to discovery, a non-movant need only make a *prima facie* showing that jurisdiction exists.  *Id.* at 84–85; *see also Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 167–68 (2d Cir. 2015) ("In order to survive a motion to dismiss for lack of personal jurisdiction, a [non-movant] must make a *prima facie* showing that jurisdiction exists.") (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013) [hereinafter *Licci III*]).  "This prima facie

---

[9] Mr. Javarone's purported motion to strike does not comply with Rule 2(E)(ii) of the Court's Individual Rules of Practice in Civil Cases.  And Mr. Javarone's argument—even if it were procedurally proper—is not persuasive.  Indeed, "[o]n a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), the Court may look beyond the four corners of the complaint and consider . . . accompanying affidavits, declarations, and other written materials." *Knight v. Standard Chartered Bank*, 531 F. Supp. 3d 755, 760 (S.D.N.Y. 2021).

[10] The Second Circuit has "long made clear that in deciding a pretrial motion to dismiss for lack of personal jurisdiction a district court has considerable procedural leeway." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (quoting *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d. Cir. 1981)) (citation modified); *see also Broidy Cap. Mgmt. LLC v. Benomar*, 994 F.3d 436, 446 (2d Cir. 2019) ("The district court has considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction.") (citation omitted).  A district court "may determine the motion on the basis of affidavits alone; or it may permit discovery in aid of the motion; or it may conduct an evidentiary hearing on the merits of the motion." *Dorchester Fin. Sec., Inc.*, 722 F.3d at 84 (quoting *Marine Midland Bank,* 664 F.2d at 904).  Because neither party has requested an evidentiary hearing, the Court declines to hold a hearing in this case.  Accordingly, the Court will "determine [Defendant's] motion on the basis of affidavits alone." *Id.*

showing 'must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant.'" *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (quoting *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010)).

"On a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), the Court may look beyond the four corners of the complaint and consider materials outside the pleadings, including accompanying affidavits, declarations, and other written materials." *Knight*, 531 F. Supp. 3d at 760; *accord MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727–28 (2d Cir. 2012). The Court "construe[s] the pleadings . . . in the light most favorable to [the plaintiff], resolving all doubts in [its] favor." *Id.* But if the parties present conflicting affidavits, "all factual disputes are resolved in the [non-movant]'s favor, and the [non-movant]'s prima facie showing is sufficient notwithstanding the contrary presentation by the moving party." *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft*, 989 F.2d at 580 (citation omitted). Courts will not, however, "draw argumentative inferences in the [non-movant]'s favor . . . [or] accept as true a legal conclusion couched as a factual allegation." *In re Terrorist Attacks*, 714 F.3d at 673 (internal quotation marks and citation omitted).

District courts "resolving issues of personal jurisdiction must . . . engage in a two-part analysis." *Bank Brussels Lambert*, 171 F.3d at 784. "First, they must determine whether there is jurisdiction over the [movant] under the relevant forum state's laws. . . . Second, they must determine whether an exercise of jurisdiction under these laws is consistent with federal due process requirements." *Id.* "To establish personal jurisdiction over a [movant], due process requires a [non-movant] to allege (1) that a [movant] has 'certain minimum contacts' with the relevant forum, and (2) that the exercise of jurisdiction is reasonable in the circumstances." *In re Terrorist Attacks*, 714 F.3d at 673 (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "To determine whether a

[non-movant] has the necessary 'minimum contacts,' a distinction is made between 'specific' and 'general' personal jurisdiction." *Id.* Courts "may assert general personal jurisdiction over a foreign defendant to hear any and all claims against that defendant only when the defendant's affiliations with the State in which suit is brought 'are so constant and pervasive as to render it essentially at home in the forum State.'"[11] *Waldman v. Palestinian Liberation Org.*, 835 F.3d 317, 331 (2d Cir. 2016) (quoting *Daimler AG v. Bauman*, 134 S. Ct. 746, 751 (2014)).  "Specific jurisdiction, on the other hand, depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Id.* (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).

### b. Section 302(a)(1) of New York's Long Arm Statute

"The New York long arm statute authorizes [specific] personal jurisdiction over non-domiciliaries under [Section 302(a)]." *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 209 (2d Cir. 2001) (citing N.Y.C.P.L.R. § 302(a) ("§ 302(a)")).  N.Y. CPLR § 302(a)(1) permits a court to exercise specific personal jurisdiction over an out-of-state party if that party either "in person or through an agent," "transacts any business within the state," and if the claim "arises from" these business transactions.  *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986).

"To meet the transacting business element under [section] 302(a)(1), it must be shown that a party purposely availed [itself] of the privilege of conducting activities within New York and thereby invoked the benefits and protections of its laws." *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 104 (2d Cir. 2006) (internal quotation marks omitted).  "To determine whether a party has transacted business in New York, courts must look at the totality of circumstances concerning the party's interactions with, and activities within, the state." *Id.* at 105 (internal quotation marks omitted).  "Although it is impossible to precisely fix those acts that constitute a transaction of business, [New

---

[11] GPC3 does not assert that this Court has general jurisdiction over Mr. Javarone.

York] precedent establishes that it is the quality of the [movant's] New York contacts that is the primary consideration." *Fischbarg v. Doucet*, 9 N.Y.3d 375, 380 (2007). "[A] non-domiciliary can be said to transact business within the meaning of [section] 302(a)(1)" if "the non-domiciliary seeks out and initiates contact with New York, solicits business in New York, and establishes a continuing relationship." *Paterno v. Laser Spine Inst.*, 24 N.Y.3d 370, 377 (2014).

As to the second requirement, "a claim 'aris[es] from' a particular transaction when there is 'some articulable nexus[12] between the business transacted and the cause of action sued upon,' or when 'there is a substantial relationship between the transaction and the claim asserted.'" *Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006) (citations omitted) (first quoting *McGowan v. Smith*, 52 N.Y.2d 268, 272 (1981); and then quoting *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467 (1988)). "[A]n articulable nexus or substantial relationship exists 'where at least one element [of the cause of action] arises from the New York contacts.'" *D & R Glob. Selections, S.L. v. Bodega Olegario Falcon Pineiro*, 29 N.Y.3d 292, 299 (2017) (quoting *Licci v. Lebanese Canadian Bank*, 20 N.Y.3d 327, 341 (2012) [hereinafter *Licci II*]). The New York Court of Appeals has "consistently held that causation is not required, and that the inquiry under [§ 302(a)(1)] is relatively permissive." *Licci II*, 20 N.Y.3d at 339. The arising under prong requires "at a minimum, a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former." *Id.* "The nexus is insufficient where the relationship between the claim and transaction is 'too attenuated' or 'merely coincidental.'" *Id.* (quoting *Johnson v. Ward*, 4 N.Y.3d 516, 520 (2005)).

## IV.    DISCUSSION

In this case, Plaintiff has not made a prima facie showing of personal jurisdiction over Mr.

---

[12] The nexus "inquiry is a fact-specific one," and "[t]here is no bright-line test for determining whether the 'nexus' is present in a particular case." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 66 (2d Cir. 2012) [hereinafter *Licci I*].

Javarone under § 302(a)(1). Plaintiff meets § 302(a)(1)'s first, "transacting business" requirement because Mr. Javarone: (1) personally transacted business in New York in both his official and individual capacity; and (2) transacted business in New York through his agent, 4D Factory. However, GPC3 does not meet § 302(a)(1)'s second requirement because all of its claims do not "arise from" Mr. Javarone's New York contacts.

### a. Mr. Javarone Personally Transacted Business in New York

Plaintiff's complaint and supporting affidavits make a *prima facie* showing that Mr. Javarone personally transacted business in New York under § 302(a)(1). Section 302(a)(1) permits a court to exercise specific personal jurisdiction over an out-of-state party if that party either "in person or through an agent," "transacts any business within the state." Section 302(a) "does not distinguish actions taken in a defendant's [individual] capacity from actions taken in his 'corporate' capacity." *Sirius XM Radio Inc. v. Aura Multimedia Corp.*, No. 21-cv-6963, 2022 WL 18587769 at *3 (S.D.N.Y. July 18, 2022) (citing *Chloé*, 616 F.3d at 164); *Pilates, Inc. v. Current Concepts Kenneth Endelman*, No. 96 CIV. 43, 1996 WL 599654 at *3 (S.D.N.Y. Oct. 18, 1996) ("[C]orporate officers who transact business . . . in New York while acting on behalf of their [corporation] are subject to personal jurisdiction in New York."). In *Kreutter v. McFadden Oil*, the New York Court of Appeals rejected the fiduciary shield exception to specific personal jurisdiction under § 302(a)(1).[13] *Kreutter*, 71 N.Y.2d at 463; *see Retail Software Servs., Inc. v. Lashlee*, 854 F.2d 18, 22 (2d. Cir. 1988) (noting that *Kreutter* "held that the fiduciary shield doctrine does not apply to any of the provisions of New York's long-arm statute"). Accordingly, the Court can impute Mr. Javarone's conduct in New York taken in his "corporate capacity" to Mr. Javarone personally.

First, Mr. Javarone personally transacted business in New York in his corporate capacity.

---

[13] The fiduciary shield doctrine "provides that an individual should not be subject to jurisdiction if his dealings in the forum State were solely in a corporate capacity." *Kreutter*, 71 N.Y.2d at 468.

Mr. Javarone formed 4D Inc., the "New York based affiliate of 4D LLC," a few days before filing

the 4D Factory bankruptcy petition "in connection with 4D LLC's relocation to New York to

facilitate capital raising, and in anticipation of [the] potential bankruptcy filing in the Southern

District of New York." Dkt. No. 28-7 at 4.  Mr. Javarone consented to move the 4D Factory

bankruptcy action to New York.  Dkt. No. 28-4 at 6.  Mr. Javarone leased 4D Factory's office space

at 57 West 57th Street, Suite 319-01 in New York City.  Dkt. No. 28-7 at 4; *see also* Dkt. No. 28-6 at

2 (identifying 4D Inc.'s principal place of business as 57 West 57th Street, Suite 319-01, New York,

NY).[14]  Mr. Javarone retained New York counsel to initiate and pursue the 4D Factory bankruptcy

and adversary proceeding in the Bankruptcy Court for the Southern District of New York.

Telyatnikov Decl. ¶¶ 12, 14–15.  Mr. Javarone signed many of the filings in both the bankruptcy and

adversary proceedings on behalf of 4D Factory.  Mr. Javarone executed two settlements in New

York:  one in the adversary proceeding and one in the underlying bankruptcy matter.  Dkt. No. 28-

16; Dkt. No. 28-17.

Second, Mr. Javarone individually transacted business in New York.[15]  Mr. Javarone was in

New York for some portion of the parties' negotiations.  *Compare* Telyatnikov Decl. ¶ 23, *with* Dkt.

No. 28-14 at 3, 4.  Mr. Javarone also executed the Agreement in New York.[16]  *Compare* Telyatnikov

Decl. ¶ 25, *with* Javarone Decl. ¶¶ 4, 5.  Mr. Javarone agreed to arbitrate any disputes under the

Agreement in New York.  Purchase Agreement ¶ 14.  And Mr. Javarone did participate in arbitration

---

[14] Mr. Javarone avers that he does not have an office in New York.  Javarone Decl. ¶ 2.  However, 4D Factory does have a New York office.  Dkt. No. 28-6 at 2; Dkt. No. 28-7 at 4.

[15] GPC3 alleges that Mr. Javarone offered to change the choice-of-law clause in the Agreement to apply New York law because he was "on the East Coast now."  Opp'n at 7.  But the final version of the parties' Agreement has a choice-of-law provision requiring the application of Delaware law.  Purchase Agreement ¶ 14.

[16] Mr. Javarone offered to "meet up" in New York on April 9, 2024—the same day Mr. Javarone executed the Agreement.  Telyatnikov Decl. ¶ 25.  The Second Circuit has held that a Court "in determining whether an out-of-state defendant transacts business in New York" may consider "several factors" including "whether, after executing a contract . . . the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship."  *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 22 (2d Cir. 2004) (quoting *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 29 (2d Cir.1996)).  Despite Mr. Javarone's offer, nothing in Plaintiff's complaint or supporting affidavits indicates that the parties did ultimately meet up in New York.

in New York as required by the Agreement until the arbitrator terminated that arbitration because Mr. Javarone allegedly failed to pay his portion of the arbitration fees. Compl. ¶¶ 29, 30–32. Accordingly, Mr. Javarone personally transacted business in New York under § 302(a)(1) both in his official and in his individual capacity.

### b. 4D Factory, as Mr. Javarone's Agent, Transacted Business in New York

Plaintiff also makes a *prima facie* showing that Mr. Javarone transacted business in New York under § 302(a)(1) through his agent, 4D Factory.[17]  The Court may exercise "jurisdiction over a principal based on the acts of an agent where 'the alleged agent acted in New York for the benefit of, with the knowledge and consent of, and under some control by, the nonresident [individual].'" *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 85 (2d Cir. 2018) (quoting *Grove Press, Inc. v. Angelton*, 649 F.2d 121, 122 (2d Cir. 1981)).  "[A] corporation can act as an agent for an individual for the purposes of § 302(a)(1)."  *Retail Software Servs., Inc.*, 854 F.2d at 22 (noting that "*Kreutter* resolv[ed] the issue of whether a corporation" can be an agent under § 302(a)(1)).

There is no real dispute in this case that 4D Factory only operated in New York with Mr. Javarone's express knowledge, consent, and control.  4D Inc. is a closely held New York

---

[17] In their briefing, the parties conflate the standards for determining whether a defendant transacted business in New York personally, but in a corporate capacity, as compared to through an agent.  *See* Mem at 7, 8; Reply at 6.  But § 302(a)(1)'s text is clear in using the disjunctive "or"—a defendant "transacts business" in New York either personally or through an agent.  *See Capitol Records, Inc. v. MP3tunes, LLC*, (noting that "individuals whose sole contacts with the forum state are in a corporate capacity are subject to jurisdiction under the long-arm statute" and that "[a]n individual defendant *may also be* subject to jurisdiction under New York's long-arm statute if a corporate defendant is acting as his agent") (emphasis added).  The parties' confusion is attributable to cases in this circuit which have also conflated the two bases for meeting § 302(a)(1)'s transacting business requirement.  *See, e.g., Duravest, Inc. v. Viscardi, A.G.*, F. Supp. 2d 628, 634 (S.D.N.Y. 2008) ("An individual defendant may be subject to specific personal jurisdiction . . . based on his actions in his corporate capacity only where the plaintiff can show that the corporation was acting as the agent of the officer (rather than vice versa, as would usually be the case.")); *see also Beatie & Osborn LLP v. Patriot Scientific Corp.*, 431 F. Supp. 2d 367, 389 (S.D.N.Y. 2006); *Arch Specialty Ins. Co.*, No. 4 Civ. 1852, 2005 WL 696897 at *4 (S.D.N.Y. Mar. 24, 2005) ("Although New York has rejected the fiduciary shield doctrine, it does not follow automatically that New York may exercise personal jurisdiction over all of a corporation's officers as a consequence of having jurisdiction over the corporation.").  The difference between the two bases is relatively straightforward:  New York's rejection of the fiduciary shield doctrine means that a court can "impute your New York conduct to you" while the agency theory of jurisdiction asks whether a court can impute "their New York conduct to you."  Section 302(a)(1)'s text explicitly recognizes this distinction.

corporation—Mr. Javarone is 4D Inc.'s founder, president, and sole shareholder. Dkt. No. 28-6 at 9; *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79 (2d. Cir. 2016) (affirming district court's finding of agency jurisdiction where individual defendant was founder and CEO who exercised "extensive control over . . . day-to-day activities"); *see Sirius XM Radio Inc.*, 2022 WL 18587769 at *4 (concluding that "there are sufficient averments of fact to establish long-arm personal jurisdiction over" the individual defendant based on his conduct on behalf of the corporation because the individual defendant was the "point person" and president of the corporation).

And 4D LLC only operated in New York with Mr. Javarone's knowledge, consent, and control. The entire "governing body" of 4D LLC is composed of only two members: Mr. Javarone, who is the managing member and "holder of 1,000,000 Membership Units," and Northern Pacific Group, which is not a managing member but which is "holder of 453,869 Membership Units." Dkt. No. 28-6 at 8, 10. Mr. Javarone, on behalf of 4D LLC, consented to move the bankruptcy litigation to New York. Dkt. No. 28-4 at 6 (explaining that the parties to the bankruptcy had consented to move the litigation "to SDNY because the Judge had indicated an expedited timetable . . . for decisions by the end of July[,] [i]t is highly unlikely that the tokens (including 4D's) won't be delivered by then." In both the bankruptcy and adversary proceeding, Mr. Javarone signed those filings which required either 4D Inc. or 4D LLC's signature. Dkt. No. 28-6 at 9, 10; *see Sea Tow Servs. Int'l, Inc. v. Pontin*, 472 F. Supp. 2d 349, 361 (E.D.N.Y. 2007) (finding personal jurisdiction under § 302(a)(1) where "the individual defendant, operated and/or managed the corporate defendants, negotiated, signed, and, renewed the Agreement [at issue] on behalf of the corporate defendants." (citation omitted)).

And 4D Factory's New York activity personally benefitted Mr. Javarone because the partial settlement reached in the bankruptcy matter required Neon to transfer the 16,000,000 SHRAP

Tokens promised to Mr. Javarone individually. *In re 4D Factory, Inc., et al.*, No. 23-11618, Dkt. No. 95 at 5 ¶ 16(c) ("Transfer of Javarone's Tokens."), 13 ¶ 5 ("This includes Cort Javarone's individual right to pursue any remedy and relief . . . based on his claim that the [SHRAP] . . . should have been delivered to him sooner."). Under that partial settlement, Mr. Javarone individually would "swiftly receive 16 million unlocked tokens that will be immediately available for sale," which he "intend[ed] to use . . . to help fund the Debtors' Chapter 11 Plan." *Id.* ¶ 25.

Because Mr. Javarone was aware of 4D Factory's transactions in New York, directly controlled those transactions, and personally benefitted from them, 4D Factory was Mr. Javarone's agent under § 302(a)(1). Mr. Javarone, through his agent, 4D Factory, transacted business in New York. Accordingly, Plaintiff has made a *prima facie* showing that Mr. Javarone meets § 302(a)(1)'s transacting business requirement because Mr. Javarone conducted business in New York both "in person" and "through an agent."

### c.  Some of Plaintiff's Causes of Action Do Not Arise from Mr. Javarone's New York Contacts

Plaintiff has not made a *prima facie* showing that all of its claims "arise from" Mr. Javarone's New York conduct. As to § 302(a)(1)'s second requirement, each of Plaintiff's causes of action[18]

---

[18] As the Second Circuit has articulated—

> [I]t is not clear whether the plaintiff['s] "claim" is to be understood more loosely as the factual circumstances surrounding the harm suffered by a plaintiff, or more strictly as the doctrinal elements if a particular theory of recovery. And if a "claim" refers to the elements of a cause of action, it is unclear whether the relevant element here is the plaintiffs' "injuries," or the defendant's wrongful act . . . [or] perhaps both . . . [Recent decisions] applying the nexus requirement . . . have generally undertaken fact-bound analyses that shed little light on how the nexus requirement should be applied.

*Licci I*, 673 F.3d at 71–72. The New York Court of Appeals, in response to the Second Circuit's certified questions in *Licci I*, "made clear that the 'arising from' prong of section 302(a)(1) does not require a causal link between the defendant's New York business activity and a plaintiff's injury." *Licci III*, 732 F.3d at 168–69. The New York Court of Appeals also clarified that a "claim" refers to the elements of a cause of action and not the factual circumstances giving rise to Plaintiff's case—"CPLR 302(a)(1)does not require that every element of the cause of action pleaded must be related to the New York contacts; rather, where at least one element arises from the New York contacts, the relationship between the business transaction." *Licci II*, 20 N.Y.3d at 341; *see also D & R Glob. Selections*, 29 N.Y.3d at 299 (same).

must "arise from" Mr. Javarone's New York conduct.  "A plaintiff 'must establish the court's jurisdiction with respect to each claim asserted.'"  *Charles Schwab Corp.*, 883 F.3d at 83 (quoting *Sunward Elecs., Inc.*, 362 F.3d at 24).  Accordingly, the Court must analyze each of Plaintiff's asserted claims independently to determine whether they "arise from" Mr. Javarone's New York conduct.

GPC3's fraudulent inducement claim (Count IV) does not arise from Mr. Javarone's New York conduct because Mr. Javarone's involvement in the New York bankruptcy and adversary proceedings is "merely coincidental" to that claim. [19]  *D & R Glob. Selections, S.L.*, 29 N.Y.3d at 299.  To establish a fraudulent inducement claim, a plaintiff must demonstrate:  (1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff."  *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d. Cir. 2001); *E.I. DuPont de Nemours and Co. v. Florida Evergreen Foliage*, 744 A.2d 457, 461–62 (Del. 1999) ("The elements . . . consist[] of:  (1) a false representation, usually one of fact, made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance.").

Here, GPC3 alleges that Mr. Javarone "to the extent [he] d[id[ not have the legal right to transfer the Tokens to GPC3, intentionally misrepresented to GPC3, on numerous occasions in March and April 2024" that he "had title" to the SHRAP Tokens,[20] that there were "no impediments

---

[19] Plaintiff cites New York law when identifying the elements of each of its causes of action.  Opp'n at 16 n.5, 17 ns. 6 & 7.  But the parties' Agreement provides that it "shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to its conflicts of laws provisions."  Purchase Agreement ¶ 14.  Because the Court does not reach the merits of Plaintiff's claims and because the elements of Plaintiff's causes of action do not substantially differ between New York and Delaware, the Court cites both New York and Delaware caselaw.

[20] The Court does not reach the merits of this case, but notes that there is a difference between whether Mr. Javarone misrepresented that he "had title" to the 16,000,000 SHRAP under the Prior Assignment and whether he had actual possession of the SHRAP Tokens.

to him assigning" SHRAP Tokens, and that "he had not pledged or agreed to sell"[21] SHRAP Tokens

to anyone else.  Compl. ¶ 46.  The alleged misrepresentations include representations that Mr.

Javarone made throughout the parties' negotiations and within the Agreement itself.  *Id.* ¶ 47.

First, neither Plaintiff's complaint nor supporting affidavits indicate that Mr. Javarone made

the alleged misrepresentations while he was in New York.  Second, Plaintiff's fraudulent inducement

claim does not arise from Mr. Javarone's conduct during either the adversary proceeding or

bankruptcy proceeding.  Nowhere does GPC3 allege that Mr. Javarone's misrepresentations were

made during either of those proceedings.  Mr. Javarone did reference and make assertions with

respect to the subject matter, strategy, and applicability of those proceedings throughout the parties'

negotiations.  But Mr. Javarone's conduct during those proceedings—the conduct that meets

§ 302(a)(1)'s first "transacting business" requirement— is "merely coincidental" to any potential

misrepresentations that happen to reference those proceedings.  Because GPC3's fraudulent

inducement claim does not "arise from" Mr. Javarone's New York conduct, the Court lacks

jurisdiction over Mr. Javarone with respect to that cause of action.[22]

### d.  28 U.S.C. § 1406(a)

Because the Court lacks jurisdiction over some of Plaintiff's claims, the Court must

determine whether to dismiss some of Plaintiff's claims or to transfer this case to the Southern

---

[21] The Court accepts Plaintiff's averment that Mr. Javarone promised to pay his attorneys in the adversary and bankruptcy proceedings "a contingent fee from the 16,000,000 Tokens that were received from Neon Machine, even though he had already agreed to transfer those Tokens to [GPC3]."  Telyatnikov Decl. ¶ 37.  An alleged misrepresentation that post-dates the execution of the Agreement necessarily cannot give rise to a fraudulent inducement claim.  Accordingly, GPC3's breach claim may "arise from" Mr. Javarone's promise to pay his attorneys with his 16,000,000 SHRAP, but not GPC3's fraudulent inducement claim.

[22] The Court need not determine whether it has jurisdiction over Mr. Javarone with respect to Plaintiff's other causes of action because the Court lacks personal jurisdiction over Mr. Javarone with respect to Plaintiff's fraudulent inducement claim and because it is not in the interest of justice to sever Plaintiff's claims.  That said—the Court notes that Plaintiff's breach of contract claim presents a thornier jurisdictional analysis because Mr. Javarone's New York conduct involves actions taken to gain possession of both his individual and 4D LLC's "buckets" of SHRAP Tokens.  GPC3's claims cannot arise from any of Mr. Javarone's New York conduct seeking possession of 4D's LLC's SHRAP Tokens, which were not the subject of the parties' Agreement.  And Mr. Javarone's did not seek possession of his 16,000,000 SHRAP Tokens through the adversary proceeding—he sought possession of 4D LLC's "bucket" of SHRAP Tokens.  *See* Reply at 5 (arguing that Mr. Javarone's SHRAP Tokens "*were never at issue in [] the 4D AP*") (emphasis in original).

District of Florida "in the interest of justice." 28 U.S.C. § 1406(a) ("§ 1406(a)"). GPC3 argues that, in the alternative, the Court should transfer this action to the Southern District of Florida, where Mr. Javarone resides and where he is subject to general jurisdiction. Opp'n at 22. Even when a court lacks personal jurisdiction over a defendant, § 1406(a) permits a court to transfer an action to another district where the case could have been brought if it is in "the interest of justice" to do so. *See Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 435 (2d Cir. 2005) (collecting cases). Section 1406(a) provides that "[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." § 1406(a). Because it is in the interest of justice to transfer, instead of dismissing, this case, the Court will transfer this case to the Southern District of Florida.

There is no dispute that jurisdiction is proper in Florida. During the pre-motion conference held on April 28, 2025, Mr. Javarone conceded that he was subject to personal jurisdiction in Florida because he resides there. Javarone Decl. ¶ 2. Mr. Javarone also consented to transfer this action to Florida. And importantly, as discussed above, the Court lacks jurisdiction over at least two of GPC3's causes of action. Even assuming that the Court could sever those causes of action over which it lacks specific personal jurisdiction from those causes of action over which the Court does have jurisdiction, the interests of justice would not be served by doing so. *Krisko v. Marvel Enter., LLC*, 473 F. Supp. 3d 288, 301 (S.D.N.Y. 2020). Severing Plaintiff's claims "raises the possibility of parallel lawsuits, which would be an inefficient use of judicial resources," while "transferring the case avoids this problem." *See Kogan Law Group, P.C. v. Brace*, No. 20-cv-1012, 2020 WL 5038764 at *10 (S.D.N.Y. Aug. 26, 2020). Accordingly, it is in the interests of justice to transfer this case to the Southern District of Florida, where Mr. Javarone resides and is subject to general personal jurisdiction.

## V.        CONCLUSION

For the reasons stated herein, the Court finds that, on these facts, transfer of this action is warranted under § 1406(a).  The Clerk of Court is directed to terminate the motion pending at Dkt. No. 25, and transfer this case to the Southern District of Florida without delay.

SO ORDERED.

Dated:  October 8, 2025
New York, New York

_____
GREGORY H. WOODS
United States District Judge